J-S14001-18

2018 PA Super 165

| IN THE INTEREST OF: T.J.J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2807 EDA 2017 |

Appeal from the Order Entered August 4, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000447-2017

| IN THE INTEREST OF: T.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2810 EDA 2017 |

Appeal from the Order Entered August 4, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0002285-2016

BEFORE:   OTT, J., McLAUGHLIN, J., and RANSOM*, J.

OPINION BY OTT, J.:                          **FILED JUNE 13, 2018**

C.M. ("Father") appeals from the August 4, 2017 decree involuntarily terminating his parental rights and the order changing the placement goal to adoption with respect to his female child, T.J.J.M. a/k/a T.M. ("Child"), born

_____

* Retired Senior Judge assigned to the Superior Court.

in July of 2016.[1]  Upon careful review, we vacate and remand in accordance with the following decision.

Child was born prematurely at 35 weeks gestation, and she had cocaine, opiates, and benzodiazepines in her system.  Trial Court Opinion, 11/27/17, at 3; N.T., 8/4/17, at 38-39.  She remained hospitalized for approximately three months.  N.T., 8/4/17, at 42.  Around the time of Child's birth, the apartment where Father and Mother resided sustained property damage due to a flood.  *Id.* at 68-69.  Upon Child's discharge from the hospital in October of 2016, Father did not have housing.  *Id.* at 68.  The court placed Child in the care of the Department of Human Services ("DHS").  The court adjudicated Child dependent on October 28, 2016, and assigned her the placement goal of reunification.  DHS did not request a finding that aggravated circumstances existed as to Father.  As such, there is no order attributing aggravated circumstances to him.

Father was required to satisfy Single Case Plan ("SCP") goals to attend supervised visitation at the office of the Community Umbrella Agency ("CUA"), and to participate in a parenting and housing program.  N.T., 8/4/17, at 42. The CUA scheduled weekly visitation for Father with Child.  *Id.* at 43.  Father attended three supervised visits after Child's discharge from the hospital in October 2016, which "went pretty well."  *Id.* at 43, 69-70.  In October 2016,

---

[1] By separate decree entered on August 4, 2017, the trial court involuntarily terminated the parental rights of D.C. ("Mother"), who did not appeal.

- 2 -

subsequent to his supervised visits, Father was incarcerated for a probation violation. *Id.* at 43, 101. Father remained incarcerated for two months. *Id.* Upon his release, Father was required to reside in a self-help program for 90 days. *Id.* at 88-89.

The CUA caseworker's first contact from Father after his release from prison was on February 23, 2017, when he was in the self-help program. *Id.* at 43. By that time, Father had obtained employment, for which he explained he was on a probationary period for an unspecified amount of time.[2, 3] *Id.* at 92. Father attended two supervised visits at an unspecified time in 2017, but he did not consistently attend visits thereafter because of his work schedule[4] and his responsibilities and/or restrictions in the self-help program. *Id.* at 44, 48. Specifically, Father testified that the CUA office was a distance by public transportation of approximately one hour and 45 minutes from his place of employment. *Id.* at 92. Nevertheless, the CUA caseworker testified that

---

[2] Father introduced into evidence, and the court admitted, a letter from his direct supervisor at his place of employment, which attested to Father's character and work ethic. *See* Father's Exhibit 1.

[3] Father testified that he began his employment in January. N.T., 8/4/17, at 91. With respect to the time of his shift, Father testified he started working from "7:00 to 3:30 and then on to 9:00 to 5:30." *Id.* at 91-92.

[4] Father's supervised visits were scheduled at the same time as Mother's visits every Thursday at 4:00 p.m. N.T., 8/4/17, at 73, 76-78. Father was unable to arrive for the visits until 7:00 p.m. *Id.* at 73.

Father stayed in contact with her on "at least [a] monthly" basis. *Id.* at 45-46.

To accommodate his work schedule, the CUA scheduled one Saturday visit for Father with Child, and, on June 30, 2017, Father confirmed that he would attend the visit. *Id.* at 73, 76. However, the visit did not occur because the foster parent was unavailable to bring Child. *Id.* at 73, 76. There is no evidence that the CUA attempted to accommodate Father's schedule for supervised visits during April, May, or June of 2017. *Id.* at 77-81. During Father's phone call to the CUA caseworker on June 30, 2017, wherein he confirmed the Saturday visit, Father informed the caseworker that, effective July 17, 2017, his work schedule would change, and that he would be available for supervised visits during the agency's daytime hours. *Id.* at 46, 78-79.

With respect to his parenting and housing goals, the CUA referred Father to the Achieving Reunification Center ("ARC") on December 14, 2016. *Id.* at 48. Father reported to ARC for his orientation meeting on December 20, 2016, but ARC closed his case on February 23, 2017, due to his non-participation. *Id.* at 48; DHS Exhibit 7.

On April 19, 2017, DHS filed a petition for the involuntary termination of Father's and Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On the same date, DHS filed a petition for a goal change to adoption.

On August 4, 2017, a hearing occurred on the petitions, during which DHS requested termination of Father's parental rights pursuant to Section 2511(a)(1), (2), and (b). DHS presented the testimony of the CUA caseworker, Amanda Mosley. Father testified on his own behalf. Mother did not appear for the hearing, but she was represented by counsel. Child was represented by a Child Advocate and a Guardian *Ad Litem* ("GAL").

At the conclusion of the testimonial evidence, counsel for the parties made closing arguments. *See* N.T., 8/4/17, at 112-121. The GAL stated, in part, "I don't think [Father's] got [sic] a settled intent to abandon the child and I think that he's made some strides towards (inaudible) the dependent issues which brought the case to [c]ourt. So I'm not sure [DHS has] met its burden. And I'd hate to lose the possibility of [him as a] reunification resource. . . ." *Id.* at 115. Thereafter, the trial court granted the involuntary termination petition on the record in open court pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). *Id.* at 126. The court did not address Section 2511(b) on the record in terminating Father's parental rights. Further, the court did not dispose of the goal change petition on the record in open court.

By decree dated and entered on August 4, 2017, the court granted the involuntary termination petition pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). By separate permanency review order dated August 4, 2017, the court changed Child's goal to adoption. Father timely filed a notice of appeal along with a concise statement of errors complained of on appeal

pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court filed its Rule 1925(a) opinion on November 27, 2017.[5]

On appeal, Father presents the following issues for our review:

1. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Father's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

2. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Father's parental rights without giving primary consideration to the effect that the termination would have on the . . . developmental, physical and emotional needs of the child as required by the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(b)?

3. Did the [t]rial [c]ourt commit reversible error, when it terminated Father's parental rights and changed the child's goal to adoption as substantial, sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the [p]etition for [g]oal [c]hange?

4. Did the [t]rial [c]ourt commit reversible error when it involuntarily terminated Father's parental rights and changed the child's goal to adoption where Father was not provided adequate services for a sufficient period of time?

Father's brief at 4.[6]

_____

[5] The trial court addressed the involuntary termination decree but not the goal change order in its opinion.

[6] Pursuant to the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, permanency planning for dependent children is conducted under the jurisdiction of the juvenile court. Pursuant to the Adoption Act, 23 Pa.C.S. § 2101, *et seq.*, involuntary termination of parental rights is conducted under the jurisdiction

We begin with Father's third and fourth issues regarding the goal change order, which we review for an abuse of discretion. ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). The Juvenile Act provides that it "shall be interpreted and construed as to effectuate" its purposes. 42 Pa.C.S. § 6301(b). The Juvenile Act's first purpose is "[t]o preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1).

The Juvenile Act provides that the court shall conduct periodic permanency hearings "for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(e)(1). Specifically, Section 6351(f) provides as follows, in relevant part.

> **(f) Matters to be determined at permanency hearing.—**
>
> At each permanency hearing, a court shall determine all of the following:
>
> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

_____

of the orphans' court. Instantly, the Honorable Lyris F. Younge presided over both matters.

- 7 -

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) **The likely date by which the placement goal for the child might be achieved.**

(5.1) **Whether reasonable efforts were made to finalize the permanency plan in effect.**

(6) Whether the child is safe.

. . .

(9) **If the child has been in placement for at least 15 of the last 22 months** or the court has determined that aggravated circumstances exist and that reasonable efforts to . . . preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child. . . .

42 Pa.C.S. § 6351(f)(1)-(6), (9) (emphasis added). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

Instantly, Father asserts that he was "working full time," which "was the best way to obtain the stable housing needed for him to be reunited" with

- 8 -

Child. Father's brief at 19-20 (citation to record omitted). Father argues that changing Child's placement goal to adoption was against the weight of evidence, as follows.

> Despite being in regular contact with the CUA social worker, DHS and CUA failed to offer Father any visits at a time that was compatible with his work schedule. Similarly, Father is willing to attend parenting and housing classes, but was not offered these services at a time compatible with his work schedule. If DHS and CUA worked with Father to establish a consistent visitation schedule and other reunification services that did not conflict with his work schedule he would be able to complete his goals, reunite with [Child] and preserve the family.

*Id.* at 20 (citations to record omitted). For the following reasons, we are constrained to agree.

The juvenile court's certified record indicates that the first permanency review hearing occurred on March 9, 2017, which found minimal compliance by Father with the permanency plan. Contrary to Section 6351(f)(5), the order did not include the likely date by which the goal might be achieved. On April 19, 2017, DHS filed the petition for a goal change, which was approximately six months after Child was placed. The next permanency review hearing occurred on June 8, 2017, which maintained the placement goal of reunification, but made no findings with respect to either parent's compliance. Like the first permanency review order, the June 8, 2017 order did not include the likely date by which the goal might be achieved. Thereafter, on August 4, 2017, the goal change/termination hearing occurred, at which time Child was in placement for ten months, less than the statutory

15 - 22 months provided for in Section 6351(f)(9). The August 4, 2017 goal change order found that there was no compliance by Mother with the permanency plan, but omits any finding with respect to Father's compliance.

During the subject proceedings, Ms. Mosley, the CUA caseworker, testified that Child was placed because Father did not have housing at the time of Child's discharge from the hospital. N.T., 8/4/17, at 68. She testified that Father was appropriate at the visits she supervised, and that the visits "went pretty well." *Id.* at 69-70. Ms. Mosley testified that Father has been cooperative with her. *Id.* at 83.

It is undisputed that Father worked full-time and had maintained communication with Ms. Mosley regarding scheduling supervised visits. There is no evidence that Ms. Mosley attempted to accommodate Father's work schedule more than once, by scheduling a Saturday visit sometime after June 30, 2017, which never occurred because of the unavailability of Child's foster parents. Father testified that his new work schedule gives him off on Fridays. However, he testified that Ms. Mosley told him that the foster parents are only available on Mondays – Wednesdays, which are impossible for him due to his work schedule. *Id.* at 94-95. Father testified that it would be easier for him

to visit with Child if she were placed in kinship care with her maternal aunt, who resides in South Philadelphia.[7, 8] *Id.* at 95, 97.

With respect to his parenting and housing goals, the CUA referred Father to ARC on December 14, 2016, four months before filing the petition for the goal change. Father testified that he was in contact with ARC regarding his work schedule, and that he and the agency tried to work around it but had been unsuccessful. *Id.* at 95. Father testified that he is willing to participate in the required classes. *Id.*

Ms. Mosley testified that Child currently receives early intervention services, which includes occupational therapy, and she is under the care of a medical specialist for gastrointestinal issues. *Id.* at 40. DHS did not present any evidence concerning Child's *daily* medical needs. As such, DHS did not focus on whether Father is capable of meeting Child's medical needs.[9]

---

[7] Father testified that he was unaware why Child was not placed with her maternal aunt. N.T., 8/4/17, at 95. At the conclusion of the testimonial evidence, the trial court stated that it would be willing to entertain a hearing on placing Child in kinship care with her aunt. *Id.* at 128-130.

[8] There is no record evidence regarding where Child's foster parents reside. Importantly, Ms. Mosley testified that they "are older[,] and they are **not** willing to adopt." *Id.* at 50 (emphasis added).

[9] Ms. Mosley provided the only testimony on direct examination regarding Father's ability to meet Child's medical needs, as follows.

> Q. And do you believe that [Father] is prepared to provide for [Child's] medical needs at this point?

In sum, the court issued the goal change order when Child had been in placement for approximately ten months, and no likely date had ever been set for the achievement of Child's placement goal. Father participated in three supervised visits immediately after Child's placement and before his incarceration and two visits on an unspecified date after his release from prison. Upon his release, Father secured full-time employment, and he was working to obtain housing and be reunited with Child. Father maintained communication with the CUA caseworker after he secured employment in an attempt to resolve the conflict between his work schedule and the requisite supervised visitation. Likewise, Father communicated with ARC in an attempt to resolve the conflict between his work schedule and the requisite parenting and housing classes. Finally, the record reveals that Child is *not* placed with a pre-adoptive resource, and that the foster parents are limited in their availability to bring Child to supervised visits. Based on the foregoing, we conclude that the evidence does not support changing Child's placement goal to adoption. Therefore, the trial court abused its discretion in issuing the order, and we are constrained to vacate.

---

A. No.

Q. Has he ever participated in her medical care at this time?

A. Not to my knowledge.

N.T., 8/4/17, at 48.

It follows that we agree with Father's first and second issues on appeal, that the court abused its discretion in terminating his parental rights. We review these issues according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In *Santosky v. Kramer*, 455 U.S. 745, 747-748 (1982), the United States Supreme Court held, "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." In addition, the Court explained:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it

- 13 -

must provide the parents with fundamentally fair procedures. *Id.* at 753-754.

Instantly, termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). In addition, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The relevant sections of the Adoption Act in this case are as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

With respect to Section 2511(a)(1), our Supreme Court has held,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).  Further,

> the trial court must consider the whole history of a given case and **not mechanically apply the six-month statutory provision**. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted) (emphasis added).

Our courts have explained that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child.  Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.  This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.  Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citations omitted); *see also In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004).

To terminate parental rights pursuant to Section 2511(a)(2), the

following factors must be demonstrated: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

To terminate parental rights pursuant to Section 2511(a)(5), the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of M.E.P.*, *supra* at 1273-1274.

To terminate parental rights pursuant to Section 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare

of the child. ***In re Adoption of M.E.P.***, ***supra*** at 1275-1276. "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." ***In re A.R.***, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time-period. ***Id.*** Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of agency services. ***In re Adoption of T.B.B.***, 835 A.2d 387, 396 (Pa. Super. 2003); ***In re Adoption of M.E.P.***, ***supra*** at 1276.

Finally, with respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the

- 18 -

circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Initially, Father argues that the court did not intend to terminate his parental rights pursuant to Section 2511(a)(5) and (8) because it granted the involuntary termination petition on the record in open court pursuant to Section 2511(a)(1) and (2) only. N.T., 8/4/17, at 126. In its appellee brief, DHS agrees. DHS brief at 8-9. The record confirms that, although DHS filed the petition under Section 2511(a)(1), (2), (5), and (8), it sought termination under (a)(1) and (2) during the hearing, which the trial court granted on the record in open court. N.T., 8/4/17, at 114, 126. Because DHS did not proceed under Section 2511(a)(5) and (8), we conclude that the trial court erred to the extent it terminated Father's parental rights pursuant to these subsections.

With respect to both Section 2511(a)(1) and (2), Father argues, in part:

DHS filed a termination petition only six (6) months after [Child] came into care. For four (4) of those six months, Father was not offered any visits that did not conflict with his work schedule. Between the time the termination petition was filed and the time of the termination hearing, Father was offered one Saturday visit. . . . Father confirmed his attendance, but the visit was ultimately cancelled due to the foster family's schedule. Similarly, DHS offered no evidence that Father was offered parenting and housing class at a time that did not conflict with his work schedule.

DHS's failure to provide Father with visits with [Child] and other necessary reunification services before filing for termination of his parental rights violates his due process rights.

Father's brief at 13-14 (citations to record omitted).

- 19 -

The trial court reasoned on the record in open court, "I did have an opportunity to receive testimony from [Father], not that I don't find him credible, but I find his testimony to be very telling."  N.T., 8/4/17, at 122.  The court emphasized Father's acknowledgment that he relied on Mother with respect to learning how Child was doing.  *Id.* at 122-123.  The court stated, "I don't know why [Father] would allow mom to be the filter by which [he] kept in contact with [Child].  Given that mom has had challenges and mom's issues are what really brought [Child] into care.  Father was aware of it.  He said he was working prior to, but as soon as [Child] was born positive for [illicit] substances, [F]ather was on notice at that point that maybe mom was not going to be a viable resource in terms of parenting for [Child]."  *Id.* at 123.  The court reasoned that, because Father communicated with Mother about Child's medical condition, he did not "demonstrate that he could independently take care of this child."  *Id.* at 123.  Indeed, in its Rule 1925(a) opinion, the trial court found, "Father failed to demonstrate he was capable of being a single parent of [Child] and depended on [Child's] [m]other."  Trial Court Opinion, 11/27/17, at 4 (citation to record omitted).

Father indeed testified that he learned about Child's medical problems by talking to Mother.  N.T., 8/4/17, at 106.  However, pursuant to the applicable law relating to Section 2511(a)(1), the trial court was required to consider Father's explanation for his conduct, which he expressed as follows on direct examination:

I'm just asking for like a fair shot and like work with me. Sometimes, like, I understand people's schedules get messed up. . . . Don't work against me. Ms. [Mosley] . . . [w]e don't communicate, because we used to communicate through [Mother]. And maybe that's my fault that I used to communicate through the child's mother. But I thought she was on the same path that I want to be on, you know what I'm saying? But now I realize today, . . . I got to do it on my own. . . .

*Id.* at 97-98. We conclude that the trial court in this case abused its discretion in mechanically applying the six-month statutory provision under Section 2511(a)(1) and not considering Father's explanation for his conduct. ***See In re N.M.B.***, ***supra***. We conclude, in light of the totality of the evidence, that Father's conduct does not clearly warrant the termination of his parental rights pursuant to Section 2511(a)(1).

With respect to Section 2511(a)(2), Father argues that, "[i]f DHS and CUA worked with Father to establish a consistent visitation schedule and other reunification services that did not conflict with his work schedule[,] he would be able to complete his goals and reunite with [Child]." Father's brief at 15. We conclude that the foregoing testimonial evidence did not demonstrate that the causes of Father's parental incapacity cannot or will not be remedied. Therefore, we conclude that the court abused its discretion in terminating Father's parental rights pursuant to Section 2511(a)(2).

Further, we reject the contention of DHS in its appellee brief that our Supreme Court's decision in ***In the Interest of D.C.D.***, 105 A.3d 662 (Pa. 2014) defeats Father's argument that the court abused its discretion in terminating his parental rights because DHS did not provide reasonable efforts

to reunify him with Child. **See** DHS's brief at 12-13. The **D.C.D.** Court held that this Court erred in reversing the trial court's termination of the father's parental rights pursuant to Section 2511(a)(2) and (b) as a result of the agency's failure to provide reasonable efforts to enable the father to reunify with his child. The Court held that there is no Pennsylvania or federal provision "that requires delaying permanency for a child due to the failure of an agency to provide reasonable services, when the court has otherwise held that grounds for termination have been established and the court has determined that termination is in the best interests of the child by clear and convincing evidence." **D.C.D.**, 105 A.3d at 676. The **D.C.D.** Court concluded:

> Applying this standard to the case at bar, the trial court did not abuse its discretion in holding that [the agency] established grounds for termination of [the f]ather's parental rights by clear and convincing evidence based on [the f]ather's continued incapacity to care for child. Moreover, the trial court recognized for purposes of subsection 2511(b) that a parent's continued incarceration may factor into a determination of the child's best interests. In this case, the court did not abuse its discretion in determining that [the c]hild's best interests will be served by terminating [the f]ather's parental rights given the absence of a bond with [the f]ather, [the f]ather's expected incarceration until [the c]hild is at least seven and likely longer, and her strong bond with her foster family with whom she has lived nearly all her life and who has indicated a desire to adopt her.

**Id.** at 677 (citation omitted). Instantly, we have concluded that DHS failed to establish by clear and convincing evidence that Father's parental incapacity cannot or will not be remedied. To the extent that DHS did not provide Father with ample time and opportunity to participate in supervised visitation and parenting and housing classes at ARC, **D.C.D.** does not control in this case.

- 22 -

Based on our disposition that the court abused its discretion in terminating Father's parental rights pursuant to Section 2511(a), we need not consider the decree pursuant to Section 2511(b). ***See In re L.M.***, ***supra*** (explaining, "Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.") Accordingly, we vacate the decree involuntarily terminating Father's parental rights and remand for entry of an order denying the involuntary termination petition.

Goal change order vacated. Case remanded for entry of a new permanency order maintaining Child's placement goal of reunification and for further permanency review hearings in juvenile court. Involuntary termination decree vacated. Case remanded for entry of an order denying the involuntary termination petition.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/18

- 23 -