J-S32032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.E.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 729 MDA 2023 |

Appeal from the Decree Entered April 17, 2023
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  87-ad-2022

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: NOVEMBERR 20, 2023**

Appellant A.T. (Mother) appeals[1] from the order granting the petition filed by the Dauphin County Social Services for Children and Youth (the Agency) to terminate Mother's parental rights to L.E.J.P. (Child), born in September of 2017.  On appeal, Mother contends that the Agency failed to meet its burden of proof and that the trial court erred when it involuntarily terminated Mother's parental rights.  We affirm.

The trial court set forth an extensive recitation of the factual and procedural history of this case.  **See** Trial Ct. Op., 6/16/23, at 1-32.  Briefly, in June of 2019, Mother agreed to temporarily place Child with a host family because she was undergoing a medical procedure and Father was unable to

---

[1] We note that the order also terminated B.P.'s (Father's) parental rights. While Father is not a party to the instant appeal, his appeal from the order shall be addressed in a separate disposition.  ***See In the Interest of: L.E.J.P., a Minor, Appeal of B.P., Father***, 728 MDA 2023.

care for Child because he was employed as a long-haul trucker. After Mother suffered complications from her medical procedure, she entered into a voluntary placement agreement with the Agency, placing Child in the Agency's care and custody.

Following a hearing on July 24, 2019, the trial court adjudicated Child dependent. At that time, the trial court ordered Mother to complete several service plan objectives for reunification. Specifically, Mother was directed to attend all court hearings, maintain a safe and sanitary home, ensure Child receives routine medical and dental care and also attend Child's scheduled appointments, complete parenting classes, meet Child's basic needs (including hygiene, nutrition, housing, clothing, etc.), participate in Parent-Child Interactive Therapy (PCIT), attend visitation with Child, maintain regular contact with the Agency, and express interest in Child's well-being. *See* N.T. Hr'g, 2/27/23, at 118-27. Following the adjudication hearing, Child was subsequently placed in foster care.

Throughout the course of the instant case, the trial court held ten permanency review hearings, with the most recent taking place on June 9, 2022. Child remained in foster care throughout this entire period. During the termination of parental rights hearing, the Agency's primary caseworker Jillian Kaminskie testified that neither Father nor Mother had "substantially complied to the extent that the Agency would expect them to [comply] to [reunite with Child]" over the course of four years. *Id.* at 138. Specifically, Ms. Kaminskie

testified that she had not seen "any indication that [Father] or [Mother] really, really want[ed] to work hard to get their child back". ***Id.***

On September 28, 2022, Child's guardian *ad litem* (GAL), Heather L. Paterno, Esq., filed a motion requesting immediate termination of both Father and Mother's visitation. Specifically, the trial court explained the GAL's position that:

> (1) Child resisted visits and often hid whenever Father came to pick him up at the foster home and that this has been a consistent pattern for more than a year; it often took up to an hour of coaxing for Child to come out of hiding; (2) school officials noticed a dramatic change in Child's demeanor when the Parents would pick him up including that Child would become withdrawn, silent, and would tell teachers he did not want to go, prompting school officials (as mandated reporters) to contact the [GAL] and express their concerns; (3) the foster family stopped informing Child when visits would occur because he would feign illness to avoid visits; (4) Father made false promises to persuade Child to visit or admonished or reprimanded Child for his reluctance to visit, rather than engaging in positive reinforcement; and (5) Mother only sporadically attended PCIT sessions, that Child reported during visits Mother often did not come out of her room and that the Parents sometimes shouted at each other when he is with them.
>
> The [GAL] expressed concern that Child's extreme reactions anticipating visits were traumatizing and that his resistance had not diminished in the past year. The [GAL] believed that the family should participate in more intensive parenting education classes to address Child's resistance, learn positive parenting techniques, and help him better adjust to and develop comfort in his Parents' home. She requested that visits thus be suspended pending the [termination of parental rights] hearing, then initially scheduled just three weeks later (on October 19, 2022). The [GAL] also requested that the [trial court] appoint legal counsel for Child, who might accurately represent and convey his wishes to [the trial court]. On September 29, 2022, [the trial court] granted the [GAL's] motion, suspending the Parents' visitation and appointing Sarah Hoffman[, Esq., legal] counsel for Child.

Trial Ct. Op. at 11-12.

On October 6, 2022, the Agency filed a petition seeking termination of Father and Mother's parental rights under 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). The trial court explained:

> After the [termination of parental rights] petition was filed, Child's attorney, [Attorney] Hoffman, filed a petition statement with the [trial] court averring that she had met with Child on multiple occasions, had spoken with him in accordance with his age and developmental level, and that it was clear to her that Child agreed with the termination of parental rights of both [Father and Mother] and a goal change to adoption. Hearings on the [termination of parental rights] petition and goal change were held before [the trial court] on February 27, March 2, [and] April 17, 2023.

Trial Ct. Op. at 13 (citations omitted) (some formatting altered).

Ultimately, the trial court granted the Agency's petition to terminate Mother's and Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a) (1), (2), (5), (8), and (b) and to change Child's permanency goal to adoption. Mother filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i). The trial court issued a Rule 1925(a) opinion explaining its reasons for terminating Mother's and Father's parental rights.

Mother raises the following issues for our review:

1. Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that enough grounds existed for a termination of [Mother's] parental rights under Section 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a)[?]

2. Whether the trial court abused its discretion and committed an error of law in determining it would be in [Child's] best interest to have [Mother's] parental rights terminated, when it failed to primarily consider [Child's] developmental, physical, and

emotional needs and welfare, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b)[?]

3. Whether the trial court abused its discretion and committed an error of law in ordering that [Mother's] visitation be suspended without affording [Mother] a meaningful opportunity to respond to and/or be heard[?]

Mother's Brief at 4 (some formatting altered).

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 5 -

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

### Section 2511(a)(1)

Mother argues that the trial court erred in concluding that the Agency presented clear and convincing evidence to terminate her parental rights under Section 2511(a)(1). Mother's Brief at 10-13. Specifically, Mother argues that the trial court failed to properly weigh the evidence demonstrating Mother's progress toward achieving her service plan objectives. *Id.* at 11. Mother further argues that her efforts to establish a "more nurturing relationship" with Child "were often thwarted by the limitations resulting from her significant medical issues outside of her own control, lack of communication and clarity from the Agency, and the difficulties posed because of the effects of the global pandemic." *Id.* at 12. Mother alleges that at no time did she "refuse to be a parent to her son or in any way give up her parental claim to him and no evidence was presented by the Agency to demonstrate otherwise." *Id.*

Section 2511(a)(1) provides as follows:

- 6 -

**§ 2511.  Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

When reviewing the involuntary termination of parental rights under

Section 2511(a)(1), this Court has explained:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

> Further, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

> Our courts have explained that parental duty "is best understood in relation to the needs of a child.  A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child.  Thus, [our Supreme] Court has held that the parental obligation is a positive duty which requires affirmative performance.  This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.  Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

***In Interest of: T.J.J.M.***, 190 A.3d 618, 628 (Pa. Super. 2018) (citations

omitted).

> This Court has long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.
>
> In ***Adoption of S.P.***, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that [he] abandoned [his] child.
>
>> Applying [***In re Adoption of McCray***, 331 A.2d 652, 655 (Pa. 1975),] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [***McCray***, 331 A.2d at 655].
>>
>> \*   \*   \*
>>
>> Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> ***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012).

***In re J.R.E.***, 218 A.3d 920, 925 (Pa. Super. 2019) (some citations omitted;

some formatting altered).

> Here, the trial court addressed Section 2511(a)(1) as follows:
>
> The evidence established under [Section 2511](a)(1) that "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Most notably, for a period of thirty-nine (39) months—between July 2019, when Mother voluntary relinquished custody of [] Child to the Agency and the filing of the [termination of parental rights]

petition, on October 6, 2022—Mother failed to perform a substantial host of parental duties.

At the initial adjudication hearing, Mother was directed to undergo a complete psychological evaluation with a parenting component and to follow all recommendations. Dr. Rosen[2] thereafter completed the evaluation and specifically recommended, at the next permanency review hearing on October 24, 2019, that Mother undergo a number of programs to address her myriad issues borne of her own background of childhood trauma and abuse. The recommendations included that Mother get a bonding assessment, undergo partial hospitalization, attend programs at the Mental Health Association or the YWCA for Advocacy Education, become active with adult case management services [], and attend couples' counseling with Father. Despite Mother's false claims that Dr. Rosen only gave her a couple of recommendations, the record reflects that Mother was present in [c]ourt when Dr. Rosen made these recommendations and in fact asked a few questions of him at that proceeding. Mother failed to complete any of these recommendations and thus squandered this opportunity to potentially bolster her ability to fulfill her parental duties.

This stage of the case was extremely important in [] Child's life, as Mother was warned by Dr. Rosen, because [] Child would be developing caregiver attachment. Dr. [Rosen] conveyed his concern of the real possibility that [] Child would be bonding with his consistent caregivers (*i.e.* Foster Parents). Thus, a bonding assessment, with recommendations, was particularly critical at this stage of [] Child's life.

The [trial court] further note[d] that the evidence presented reflected that couples counseling was also particularly important in this case wherein Mother admitted in a number of social media posts that she was being abused by Father, including an incident where she claimed he had choked her.

As detailed above, Mother failed in multiple ways to visit [] Child early in the case when her attachment to [] Child was very much in the balance. For example, just a few months into placement, in September 2019, Mother missed numerous supervised

---

[2] Dr. Howard Rosen was the psychologist who performed Mother's psychological evaluation as part of her court-ordered service plan objectives. *See* Trial Ct. Op. at 14.

visitation sessions at the Northern Dauphin facility despite being offered transportation and despite then living fairly close to that facility. A short time later, Mother failed to complete the Pressley Ridge parenting program (the first time around), missing five appointments between December 2019 and January 2020. As a result, Pressley Ridge unsuccessfully discharged her. Similarly, in March 2020, Mother was discharged from the YWCA Visitation Center for non-compliance after completing only a single visit. After COVID restrictions limited in-person visitation, she and Father both failed to consistently adhere to the remote visitation schedule set up with [] Foster Parents from the early part of 2020 through the summer of 2020. At this point, [] Child had already been in placement for approximately one year and Mother was additionally squandering these vital opportunities to establish regular visitation and/or complete parenting training to address attachment issues, and to seek a bonding assessment, as was recommended by Dr. Rosen in order to get a professional evaluation and recommendations regarding her relationship with [] Child.

In December 2020, [] Parents began supervised visitation with Pressley Ridge. This time, Mother was more amenable to the program and sustained her attendance. Originally, she was permitted only supervised visits with [] Child, later broadened to partial[] supervision. The visits were progressing to the point that the hearing officer at the July 29, 2021 permanency review hearing recommended increased visitation. Mother never advanced far enough with Pressley Ridge, however, to obtain unsupervised visitation with [] Child despite [the] lengthy duration in that program. As noted, she was [] Child's primary caregiver, as between Mother and Father.

Even when a visitation occurred, there were problems noted by third parties. For instance, at a November 6, 2020 supervised visit at ChildFirst,[3] [] Child turned his back on [] Parents and mumbled and whined. When the supervisor asked [] Parents to come over to [] Child, Mother refused, a clearly inappropriate response to [] Child's rejection of her. As a result of this incident, ChildFirst recommended to the Agency [that] Parents undergo parenting education. On July 29, 2021, while in the Agency

_____

[3] ChildFirst Family Services provided supervision for some of Mother and Father's visits with Child. *See e.g.* Trial Ct. Op. at 6, 37, 44; Agency's Pet. for Involuntary Termination of Parental Rights, 10/6/22, at ¶ 41.

waiting room prior to a permanency review hearing, a caseworker observed [] Parents having no interaction with [] Child and that [] Parents left without saying goodbye to [] Child. This incident was relayed to the [GAL] who requested a bonding assessment, which was granted. In addition, there was credible evidence presented that daycare personnel and/or [] Foster Parents reported that [] Child returned from parental visits without a fresh diaper or that he had not eaten properly. Caseworker [Kaminskie] credibly testified that she believed from her observations that [] Parents never really wanted to visit [] Child and that in Mother's case, she appeared to treat visitation as an inconvenience.

Beginning around August 2021, the tenor of the exchanges between [] Parents and [] Child dramatically changed to the point they became extremely traumatic and distressing to [] Child[]. These emotional transitions, which Agency personnel testified were without precedent in their experience, occurred on at least nineteen (19) occasions through early January 2022, a period of only four months. While Father alone picked up [] Child on numerous occasions, Mother was also present for others and there is no evidence that her presence had any positive influence.

The bonding assessments, completed on October 26, 2021, unequivocally reflected that Mother was failing to perform parental duties. [Donna Mae] Fierras[4] found that [] Child had a disorganized attachment to Mother and Father and perceived both as sources of threat and distress, and that placement of [] Child with them would be detrimental to [] Child's physical, emotional and mental health. [Ms.] Fierras found that Mother had the intellectual capacity to learn new skills and that she and Father needed PCIT to smooth any reintegration process as well as play therapy for [] Child.

PCIT was later arranged with Dr. Allen,[5] however, Mother failed to attend the vast majority of the interactive therapy sessions throughout much of 2022, attending only three out of dozens of the sessions. PCIT was specifically designed to provide immediate feedback to Mother as to parenting skills so that she could care

---

[4] Ms. Fierras was the psychologist who conducted the bonding assessment. **See** N.T. Hr'g, 2/27/23, at 21, 23.

[5] Dr. Brian Allen conducted PCIT with Child, Mother, and Father. **See** Trial Ct. Op. at 11.

for [] Child without supervision, which was imperative given her primary caregiver status. Mother's excuse, that she could not get to the sessions due to foot surgery, was not credible wherein the Agency offered evidence it would transport Mother to the sessions as needed and had confirmed that Dr. Allen's office was wheelchair accessible. Mother failed to provide any medical evidence or excuse supporting her claim.

Mother also failed to take the initiative to regularly contact [] Foster Parents or the Agency over the life of the case to find out how Child was doing. What contacts were made were mostly initiated by Father. The record further reflected that Mother's parental rights to her older child were terminated in October 2020 and Mother thus was aware early in this case of the demands that would be made upon her to reunify with [] Child.

Finally, the evidence also reflected Mother's overall compliance with Agency objectives remained largely minimal or non-compliant throughout the life of the case. Mother's primary caseworker credibly testified that Mother and Father had not worked very hard to reunify with [] Child, that she failed [to] see any attachment or a nurturing bond between them, and observed nothing beneficial to [] Child from his relationship with either parent. The caseworker also credibly testified that she had never seen either parent demonstrate an ability to care for [] Child independently or together as a couple, nor demonstrate a full understanding of what was needed to properly care for a child.

Trial Ct. Op. at 35-39 (some formatting altered).

Following our review of the record, we discern no abuse of discretion or error of law in the trial court's conclusion that the Agency presented clear and convincing evidence to support termination of Mother's parental rights under Section 2511(a)(1). *See T.S.M.*, 71 A.3d at 267.

The record reflects that, at the time of the termination hearing, Child had been in the Agency's care for forty-two months. *See* N.T. Hr'g, 2/27/23, at 78. Although Mother has been aware of her service plan objectives throughout the life of the case, she has made only minimal progress towards

reunification. Specifically, over a six-month period, Mother attended two PCIT therapy sessions. *Id.* at 126. Further, the record reflects that Mother's direct communications with the Agency regarding Child's well-being were limited to approximately thirty times over a nearly four-year period. *Id.* at 127. Ms. Kaminskie also testified that the Agency had concerns that Child was not being fed appropriately during his visits with Mother and Father. *Id.* at 125. Therefore, we agree with the trial court that, for a period far in excess of the six-month statutory minimum, Mother has refused to perform her parental duties to Child. *J.R.E.*, 218 A.3d at 925; *T.J.J.M.*, 190 A.3d at 628.

With respect to Mother's explanation for her conduct, the record reflects that Mother denied the Agency's allegations. Specifically, in response to the Agency's allegation that Child would return from visits with Father and Mother with a wet diaper or pullup, Mother testified that she and Father regularly changed Child's diaper as needed. *See* N.T. Hr'g, 3/2/23, at 21-22. Mother also attributed issues with Child returning from visits with a wet diaper or pullup to Child's failure to communicate his needs. *Id.* at 22. Additionally, Mother testified that she had initially attempted to keep in regular contact with the Agency, however, Agency employees failed to promptly return her calls and Mother alleged that Ms. Kaminskie would get "snippy" with her, so Mother would "try to avoid that." *Id.* at 16-17. Mother stated that Father would communicate with the Agency on her behalf. *Id.* at 17. With regard to the Agency's allegation that she failed to comply with the recommendations following her psychological evaluation, Mother testified that she was never

notified of all of the recommendations. *Id.* at 17-18. Ultimately, the trial court credited Ms. Kaminskie's testimony that Mother "had not worked very hard" to unify with Child. *See* Trial Ct. Op. at 39; N.T. Hr'g, 2/27/23, at 138; *see also S.P.*, 47 A.3d at 828 (stating that where a "parent does not exercise reasonable firmness in declining to yield to obstacles, [her] other rights may be forfeited" (citation omitted)).

For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(1).[6] *See T.S.M.*, 71 A.3d at 267 *J.R.E.*, 218 A.3d at 925; *T.J.J.M.*, 190 A.3d at 628. Accordingly, Mother is not entitled to relief.

## Section 2511(b)

Mother also challenges the trial court's conclusions concerning Section 2511(b). Specifically, Mother argues that the trial court erroneously "gave great weight" to the bonding assessment conducted by Ms. Fierras. Mother's Brief at 15. Mother further argues that the bonding assessment used by Ms. Fierras was "designed for children younger than [Child] was at the time, and this was only the second assessment that [Ms.] Fierras performed." *Id.* Additionally, Mother contends that while the trial court heard evidence regarding Child's negative reactions to visitations with Mother and Father, "there was evidence of [] Child's positive and happy reactions during visitation

---

[6] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a). *B.L.W.*, 843 A.2d at 384.

that spanned over a long period of time during the dependency case which suggests that [] Child and Mother possess a mother-son bond." ***Id.***

Section 2511(b) provides as follows:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships . . .

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by* ***Interest of K.T.***, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is

not always an easy task.'" ***T.S.M.***, 71 A.3d at 267. In ***K.T.***, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." ***Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023). Indeed, the parent-child bond analysis must include "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.***

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 296 A.3d at 1113.

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

In the instant case, the trial court addressed Section 2511(b) as follows:

- 16 -

The overwhelming bonding evidence presented was that the termination of Mother's parental rights will have no detrimental effect on [] Child whereas a severance of any bond between [] Child and [] Foster Parents would be highly detrimental to [] Child. The evidence upon which [Ms.] Fierras based her conclusions was further corroborated by numerous other witnesses, including evidence of traumatic and highly distressing transitions with the Parents and [] Child, and the absence of a perceivable bond between them. Contrary to Mother's argument, there was no credible evidence presented that termination of Mother's [parental] rights would have a negative impact upon [] Child's developmental, physical and emotional needs, and the welfare of [] Child. As noted, [Ms.] Fierras presented evidence that [] Child established predominantly secure and positive attachments or bonding with his Foster Parents and that [] Child would suffer harm if his bonds with [] Foster Parents were severed.

. . . [T]he record strongly supported that [] Child's developmental, physical and emotional needs and welfare are best served by termination of Mother's parental rights.

Notably, [Ms.] Fierras presented credible evidence that [] Child "has a disorganized attachment to [Mother and Father] **and perceives them as sources of threat and distress and that placement with his biological parents would be detrimental to [] Child's physical, emotional and mental health.**" With regard to Mother in particular, she did not represent a safe emotional space for [] Child. The poor attachment and attachment style [Ms.] Fierras observed between [Mother, Father, and] Child is one typically seen of a child who has experienced trauma and does not feel physically or emotionally safe. She noted that this attachment style is characterized by fear and a sense of mistrust and as such, [] Child did not seek out either [Mother or Father] to meet his emotional needs.

Trial Ct. Op. at 41-42 (emphasis in original).

Based on our review of the record, we discern no abuse of discretion in the trial court's conclusion that termination of Mother's parental rights would best serve Child's needs and welfare. *See K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267. As noted by the trial court, Ms. Fierras testified that she

performed a bonding assessment involving Child. N.T. Hr'g, 2/27/23, at 21, 23. As part of the bonding assessment, Ms. Fierras performed bonding assessments for Father, Mother, and Foster Parents. *Id.* at 23. Ms. Fierras concluded that Child had a "secure attachment" with Foster Parents. *Id.* at 25-26. Ms. Fierras further testified that removing Child from Foster Parents "would not be in his best interests." *Id.* at 35.

Relating to Mother and Father, Ms. Fierras testified that Child's bonding was a "resistant disorganized attachment type." *Id.* at 49. Ms. Fierras specifically stated that such an attachment style "usually stems from poor attachment, inconsistently being able to meet a child's physical and/or emotional needs, not being able to console a child for whatever reason, [and] low nurturance[.]" *Id.* at 50. Ms. Fierras further concluded that Child, during the bonding assessment, did not seek out Mother or Father to meet his emotional or other instrumental needs, and she observed that Child did not try to maintain contact with Mother and Father. *Id.* at 51-52. Ms. Fierras opined that such an attachment style is "characterized by fear and mistrust toward Mother and Father." *Id.* at 52. As noted above, the trial court concluded that "the record strongly supported that [] Child's developmental, physical and emotional needs and welfare are best served by termination of Mother's parental rights." *See* Trial Ct. Op. at 42. For these reasons, we conclude that the trial court did not abuse its discretion when it terminated Mother's parental rights. *See* 23 Pa.C.S. § 2511(b); *K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267.

**GAL's Motion**

In her final issue on appeal, Mother argues that the trial court abused its discretion and committed an error of law by granting the GAL's motion for suspension of visitation without providing Mother with the opportunity to respond.  Mother's Brief at 16.

The Pennsylvania Rules of Appellate Procedure require that appellate arguments include "discussion and citation of authorities as are deemed pertinent."  Pa.R.A.P. 2119(a).  Specifically, we have stated that "[w]e shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument[,]" as doing so "would place this Court in the conflicting roles of advocate and neutral arbiter."  ***Trust Under Deed of Wallace F. Ott***, 271 A.3d 409, 421 (Pa. Super. 2021) (citations omitted). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived." ***Coulter v. Ramsden***, 94 A.3d 1080, 1088 (Pa. Super. 2014) (citation omitted).

Here, Mother fails to provide this Court with any discussion of or citation to relevant authority pertaining to her final issue on appeal.  In fact, aside from her general claim of trial court error in her point heading, Mother provides no analysis or argument as to how or why the trial court erred when it granted the GAL's motion for suspension of visitation.  ***See*** Mother's Brief at 16.  Rather, Mother's argument is little more than a recitation of the relevant procedural history regarding the GAL's motion.  ***Id.***  We find that

Mother has not sufficiently developed this issue for appellate review; therefore, the issue is waived on appeal. ***See Trust of Ott***, 271 A.3d at 421; ***Coulter***, 94 A.3d at 1088. Accordingly, Mother is not entitled to relief. For these reasons we affirm the trial court's order terminating Mother's parental rights to Child, L.E.J.P.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/20/2023