J-S25029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2034 MDA 2018 |

Appeal from the Decree Entered November 13, 2018
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s): 47 Adopt 2018,
CP-28-DP-0000054-2017

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 20 MDA 2019 |

Appeal from the Order Entered November 13, 2018
In the Court of Common Pleas of Franklin County Juvenile Division at
No(s): CP-28-DP-0000054-2017

BEFORE: STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MAY 31, 2019**

D.W. (Father) appeals from the order denying his motion for modification of placement and termination of dependency as to his minor daughter, A.W. (Child). After careful review, we affirm.

Child was born in March 2017 to Father and T.B. (Mother).[1]  In June 2017, the Franklin County Office of Children and Youth Services (CYS) visited the family due to concerns about both parents' drug use.  *See* N.T., 8/21/18, at 6.  During a meeting with caseworkers, Father appeared intoxicated and refused a drug test; Mother tested positive for cocaine, buprenorphine, and tetrahydrocannabinol (THC).  *Id.*  CYS initiated a safety plan to assist the family with obtaining services, and advised Mother to seek medical treatment for Child's severe diaper rash.  *Id.* at 6-7.

On June 16, 2017, Father was incarcerated for a probation violation after testing positive for cocaine and benzodiazepines.  *Id.*  On June 21, 2017, CYS caseworkers learned that Mother had violated the safety plan; consequently, CYS filed applications for emergency protective custody and shelter care, as well as a dependency petition.  That same day, the court granted CYS emergency protective custody of Child.

Child was adjudicated dependent on August 25, 2017.  A finding of aggravated circumstances was entered against Mother based on the prior involuntary termination of her parental rights to three older children.  The trial court held permanency review hearings as to Child in September 2017 and December 2017.  In February 2018, CYS filed a petition to involuntarily terminate the parental rights of Mother and Father to Child pursuant to 23

---

[1] Mother is not a party in this appeal.

Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Further permanency review hearings were held in April 2018 and July 2018.

In August 2018, Father filed a "motion for modification of placement and termination of dependency." *See* Motion for Modification, 8/21/18, at 1-2. Father requested that the court stay proceedings, terminate Child's dependency, and modify Child's placement. *Id.* Specifically, Father argued that Child should be placed with T.L. and W.L., who had adopted three of Mother's older children.[2] *Id.* Father claimed that CYS put little effort into fostering a relationship between Child and W.L. and T.L., and that keeping the siblings together was important. *Id.* The court denied the motion to stay and scheduled a hearing on the motion for the same day as the termination hearing.

On August 21, 2018 and November 13, 2018, the court held hearings on Father's motion for modification of placement and termination of dependency, as well as CYS's involuntary termination petitions. CYS caseworker Hanna Creen, CYS supervisor Kari Coccagna, and Children's Aid Society foster care case manager, Aaron Mayeski, all testified on behalf of CYS. Mother and Father, represented by counsel, testified on their own behalves. Additionally, T.L. testified.

Ms. Creen testified about Father's noncompliance with his family services plan. Father has been repeatedly incarcerated during the pendency

---

[2] The three children are Child's half-siblings.

of this case, and was released from jail in August 2017. *See* N.T., 8/21/18, at 24-25. He did not address his substance abuse issue, and was incarcerated again from October 2017 through November 2017, following a positive test for cocaine. *Id.* Father was discharged from drug and alcohol treatment for lack of attendance in January 2018. *Id.* at 26. He was incarcerated in January 2018 through February 2018, following an additional positive drug test. *Id.* In April 2018, Father was once more discharged from outpatient treatment due to poor attendance. *Id.* In May 2018, Father was removed from the jail diversion program and incarcerated; he remained incarcerated at the time of the hearing, and had an estimated release date of April 2019.[3] *Id.* at 27-28. Father had not participated in psychiatric treatment since May 2018, had not maintained stable housing, and did not obtain employment. *Id.* at 29-30.

Regarding Child's potential placement with W.L. and T.L., Ms. Creen testified that CYS explored the "L." family as a kinship resource; however, due to the number of family members in the household, CYS had to obtain a waiver from the state to obtain a kinship study. *Id.* at 33-34. W.L. and T.L. were approved in December 2017, and CYS recommended that Child be placed with them. *Id.* at 35. However, Father and Mother objected, and Child remained in foster care. *Id.* CYS continued to explore the possibility of placing Child with the family as an adoptive resource and held seven visits from December 2017 through March 2018. *Id.* at 56-57. The visits "did not go well," with

---

[3] Father's current incarceration status is not evident from the record.

W.L. and T.L. unable to soothe Child, and CYS was concerned that the family's goal was to have Child in their home rather than work toward reunification. *Id.* at 39. Also, CYS would have to obtain a new waiver prior to Child being placed permanently with the family. *Id.* at 45-46.

Mr. Mayeski testified that it was difficult for Child to be "handed off" between foster parents and W.L. and T.L.; Child would cry and engage in "self-soothing" behavior. *Id.* at 89-90. As time went on, Child's discomfort with W.L. and T.L. seemed to increase rather than decrease. *Id.* at 91-92. W.L. and T.L. asked Mr. Mayeski questions about the case and interactions with CYS, rather than Child. *Id.* at 92-93.

T.L. testified that although she and W.L. have six children living in their home, they wished to adopt Child. *See* N.T., 9/25/18, at 4-5. T.L. denied Mr. Mayeski's characterizations of her interactions with Child. *Id.* at 11. T.L. does not believe that Child will develop a meaningful relationship with her half-siblings if placed in another home, and that it is in Child's best interests to develop a relationship with her siblings. *Id.* at 39, 47, 62.

Father testified that he did not believe he would be released from jail in time to achieve his reunification goals. *Id.* at 70. Although Father originally opposed placement with W.L. and T.L., Father changed his mind, contested Child's adoption, and wanted Child placed with her siblings while he continued to work toward reunification. *Id.* at 70-75.

Finally, Child's guardian *ad litem* and legal counsel, Abagail Salawage, Esquire, testified that she did not recommend that Child be placed with T.L.

and W.L., based on her observation of the quality of Child's visits with the "L."

family, as opposed to the bond Attorney Salawage observed between Child

and her foster family. *Id.* at 118-119. Additionally, Attorney Salawage

expressed concern that the parents only supported placement with W.L. and

T.L. because they would be able to have continued contact with Child. *Id.*

Attorney Salawage advocated for termination of both parents' parental rights.

*Id.* at 119.

At the conclusion of the hearings, the court denied Father's motion,

terminated Father's parental rights, and changed Child's permanency goal to

adoption.[4] Father timely filed a notice of appeal and concise statement of

errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises a single issue for our review:

> 1. Did the Juvenile Court err[] in denying [Father's] Motion for
> Modification of Placement and Termination of Dependency?

Father's Brief at 7.

With regard to dependency:

> [t]he standard of review which this Court employs in cases of
> dependency is broad. However, the scope of review is limited in
> a fundamental manner by our inability to nullify the fact-finding of
> the lower court. We accord great weight to this function of the

---

[4] On appeal, Father challenges only the denial of his motion. Insofar as the record reflects, he has not appealed the termination of his parental rights, nor the permanency goal change. While it does appear that Father filed two notices of appeal, one on the dependency docket at CP-28-DP-54-2017 and one on the termination docket at 47 Adopt 2018, his concise statement of errors complained of on appeal is identical on each docket, and his brief is likewise identical on each docket. By order dated February 1, 2019, this Court consolidated the appeals *sua sponte*.

hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re N.A.*, 116 A.3d 1144, 1148 (Pa. Super. 2015). Thus, we employ an abuse of discretion standard. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

Further:

[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

Regarding the disposition of dependent children, the Juvenile Act, 42 Pa.C.S. §§ 6351(e)-(g), provides the criteria for a permanency plan and the review of the plan. The Act provides that permanency review hearings be conducted within six months of a child's removal from the parents' care, and within six months of each prior permanency hearing until the child is either returned to the parents or removed from the jurisdiction of the court. *See* 42 Pa.C.S.A. § 6351(e)(3)(i). The purpose of the hearings is to review the permanency plan, determine the date by which the goal of permanency might be achieved, and determine whether placement continues to be best suited to the safety, protection, and physical, moral, and mental welfare of the child.

*See* 42 Pa.C.S.A. § 6351(e)(1). At the conclusion of the permanency review hearing, the court must issue an order determining a disposition best suited to the safety and protection, as well as the physical, mental, and moral welfare of the child. *See* 42 Pa.C.S.A. § 6351(g).

The Juvenile Act specifies that the trial court determine:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

...

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

...

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities ...

42 Pa.C.S.A. § 6351(f).

Based upon the determinations under Subsection (f), the court orders an appropriate placement. *See* 42 Pa.C.S.A. § 6351(f)(1). A trial court is not required to itemize its findings, so long as it considers the various factors of § 6351(f), concludes that reunification is not the appropriate placement goal, and provides reasons for its conclusion that are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). During permanency reviews, the statute mandates a focus on the child's best interests, and the safety,

permanency, and well-being of the child take precedence over all other considerations. *See In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008); *In Interest of: T.J.J.M.*, 190 A.3d 618, 623-24 (Pa. Super. 2018).

Further, we recognize:

[i]n Pennsylvania, a juvenile court may award permanent legal custody to a child's caretaker pursuant to Section 6351(a)(2.1) of the Juvenile Act. This is an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. Parental rights are not terminated. The custodian is typically provided a financial subsidy for the child by the local county children and youth agency. The subsidy component is generally an integral component when permanent legal custody is considered a viable option.

A trial court may consider permanent legal custody, upon the filing of a petition by a county children and youth agency that alleges the dependent child's current placement is not safe, and the physical, mental, and moral welfare of the child would best be served if subsidized permanent legal custodianship (SPLC) were granted. Upon receipt of this petition, the court must conduct a hearing and make specific findings focusing on the best interests of the child. In order for the court to declare the custodian a "permanent legal custodian" the court must find that neither reunification nor adoption is best suited to the child's safety, protection and physical, mental and moral welfare.

. . .

In those cases where reunification is not appropriate, adoption is viewed as providing the greatest degree of permanence. In some situations, however, adoption may not be a realistic or appropriate option. For example, some older children, who are well familiar with and have affection for their birth parents, may object to termination proceedings. There are also special needs children for whom placement in an adoptive home is extremely difficult. Consequently, in those cases, attention may be focused on alternative permanency options such as guardianship, or custodial arrangements (PLS), preferably with relatives.

*In re S.H.*, 71 A.3d 973, 977–78 (Pa. Super. 2013) (some internal citations omitted).

Instantly, Father argues that the court erred in denying his petition for modification of Child's placement and termination of dependency because it is in Child's best interests for W.L. and T.L. to become Child's permanent legal custodians. *See* Father's Brief at 11-12. Father contends that Child should have been placed with the "L." family and her half-siblings. *Id.* Father also makes vague, nonsensical arguments regarding Child's foster placement without further explanation – for example, stating that that foster parents "had been groomed for a substantial period prior to the filing of the termination of parental rights petition"; that CYS did not call experts to testify regarding trauma and short-term harm or benefits to Child; and that the bond between foster parents and Child "is irrelevant when determining long term interests of the Child." *Id.* at 13-14.

We first note that Father fails to cite relevant legal authority to support his claims – for example, that CYS was required to call experts, that the bond between Child and foster parents was irrelevant, among others – and accordingly, risks waiver. *See*, *e.g.*, *S.M.C. v. W.P.C.*, 44 A.3d 1181, 1189 (Pa. Super. 2012); *see also Umbelina v. Adams*, 34 A.3d 151, 161 (Pa. Super. 2011) (where a brief fails to provide discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived); *see also Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) ("This Court will not act as

counsel and will not develop arguments on behalf of an appellant."); *see also* Pa.R.A.P. 2119(a).

Additionally, where Father does cite legal authority to support his argument regarding Child's best interests, such citation is to the Pennsylvania Dependency Benchbook. *See* Father's Brief at 14. The Pennsylvania Dependency Benchbook is a compendium on Pennsylvania dependency law that provides an overview of the subject for juvenile court judges. It is not "intended to be construed as legal advice or considered a substitute for statutory, procedural or other legal authority." *See* Pennsylvania Dependency Benchbook, Office of Children and Families in the Courts, 2014; *see also In Interest of L.T.*, 158 A.3d 1266, 1278 (Pa. Super. 2017) (noting that the Juvenile Act is dispositive in dependency cases). Father further risks waiver by relying on the Benchbook as precedent to the exclusion of statutory and case law. Regardless, there is no merit to Father's argument.

As we observed, *supra*, the trial court conducts permanency review hearings to address a child's best interests. The safety, permanency, and well-being of the child take precedence over all other considerations. *T.J.J.M.*, 190 A.3d at 623-24. Here, the trial court did not abuse its discretion in determining that subsidized permanent legal custodianship with the "L." family was not in Child's best interests.

First, CYS did not file a petition seeking this placement and did not allege that Child's placement was unsafe. *See S.H.*, 71 A.3d at 977–78. On the contrary, while CYS had initially explored placing Child with W.L. and T.L., the

parents at that time were opposed to such placement. Months later, after Child had acclimated to a secure, loving home with her foster family, who are a pre-adoptive resource, Father – somewhat nebulously – requested the change in placement. In doing so, Father does not allege that Child's foster home is unsafe or otherwise unsuitable, but instead asserts that CYS and Child's foster parents "did not wish" for a successful relationship between the "L." family and Child. *See* Father's Brief at 13.

Second, Father conceded that he was unlikely to achieve his reunification goals. In cases where reunification is not appropriate, adoption is the option offering the greatest permanency to a child. *S.H.*, 71 A.3d at 977–78. Placing Child in permanent legal custody would not achieve the same level of permanency as terminating Father's parental rights and allowing for Child's adoption by the foster family that has provided a secure and loving home for Child during the pendency of this case. While Father argues that permanent legal custody with W.L. and T.L. would allow the court to end a dependency matter, so too would adoption – but without the degree of uncertainty that legal custody would confer upon Child.

The trial court explained its decision as follows:

> The instant case presents the [c]ourt with a difficult dilemma; place the child with the L. family under permanent legal custody or terminate parental rights and free the child for adoption . . . Should the [c]ourt grant Father's request, the child will be placed with the L. family – which includes her three biological half-sisters. At present, the L. family is permitting Mother to have contact with their adoptive daughters, Mother's biological children.

We are aware the Mother and the child do share a parent/child bond.

T.L.'s testimony regarding her desire to help Mother and be a resource for the child was credible. We believe T.L. wants to be a permanent resource for the child; however, not simply care for the child on a temporary basis while she sees Mother through a challenging period and then have the child leave her family. T.L. wants the child to be part of their family on a permanent basis. She wants the four sisters under the same roof and genuinely believes that is the only way for the girls to have a close, sibling bond. Whether we agree with T.L.'s analysis of the children's ability to develop a meaningful sibling relationship, her motives are clear and genuine.

. . . we note that permanent legal custody by its very nature provides for a lesser degree of permanence than does adoption. While the L. family would have legal and physical custody of the child, their custody rights could, at any point(s) in the future, be challenged by Mother and/or Father. It would then be up to a custody court to decide the matter using applicable child custody law. This scenario could result in periodic or even constant upheaval for the child.

In addition, the evidence suggests the child did not seem to be comfortable with the L. family. Certainly we agree with T.L.'s position that a bond cannot be established in just seven or eight one-hour visits. Developing a meaningful bond with the child would take true effort - effort the L. family appears quite willing to give. However, we also agree that the child could and should start to become more comfortable with T.L. after numerous visits. Inexplicably, this has not occurred. The child has formed a parent/child-type bond with her foster parents. As we noted above, she looks to her foster parents for love, comfort, guidance, and support. The foster family is also committed to being a permanent resource for the child.

Unfortunately, weighing all of the available and credible evidence, what this case must come down to is timing... At a time when the Agency was ready, willing, and able to place the child in the kinship care of the L. family, Mother's and Father's adamant opposition prevented the placement. The child remained with her foster family as per her parents' requests. The child's bond with her foster parents grew and developed as one would naturally

- 14 -

> expect. We have looked [at] this case from all perspectives and believe that it is not in the child's best interest to separate her from her foster parents - who are pre-adoptive resources - to create a less permanent relationship with the L. family. Further, while we have already determined that reunification is not appropriate, we cannot find that adoption is NOT best suited to the child's safety, protection and physical, mental and moral welfare.

Trial Court Opinion, 11/13/18, at 25-27 (underlining in original, citation omitted).

Upon review, we find that the record supports the trial court's conclusion regarding Child's best interests. *S.H.*, 71 A.3d at 977–78. Accordingly, the trial court did not commit an error of law or abuse its discretion in denying Father's petition to modify placement and terminate dependency. *In re N.A.*, 116 A.3d at 1148; *L.Z.*, 111 A.3d at 1174.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/31/2019