J-S09016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1395 WDA 2022 |

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000119-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1396 WDA 2022 |

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  CP-02-AP-0000060-2022

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:                          **FILED:  May 16, 2023**

M.M. ("Mother") appeals from the October 25, 2022 orders that involuntarily terminated her parental rights to her sons, C.M., born in October of 2020, and J.M., born in October of 2021.[1]  We affirm.

---

[1]  The orphans' court also terminated the parental rights of the putative father of both children, G.H., and any unknown father of J.M.  Neither G.H. nor any unknown father appealed.

We glean the factual and procedural history of this matter from the certified record. Mother has a history of mental health problems, drug and alcohol abuse, and intimate partner violence ("IPV") involving her paramour, G.H., who is the putative father of C.M. and J.M. *See* N.T., 9/30/22, CYF Exhibit 1 at ¶ 14. The Allegheny County Office of Children, Youth, and Families ("CYF") first became aware of Mother's state of affairs in October of 2018, shortly after the birth of an older child, who is not a subject of this appeal. *Id*. Two years later, at the time of C.M.'s birth, CYF received a report that reiterated the same issues with Mother and alleged that Mother admitted having "thoughts of harming" C.M. *Id*. at ¶ 15.

The trial court placed C.M. in shelter care and, on January 20, 2021, it adjudicated C.M. dependent. In furtherance of C.M.'s permanency goal of reunification, the court ordered Mother to participate in: (1) a drug and alcohol assessment at the Pennsylvania Organization for Women in Early Recovery ("POWER"); (2) random drug screens; (3) mental health treatment; (3) supervised visitation and coached visitation; and (4) an IPV program at the Women's Center and Shelter. *Id*. at ¶¶ 26-28.

Less than one year after C.M.'s adjudication, Mother gave birth to J.M., at which time she tested positive for cocaine. The court placed J.M. in CYF's emergency custody three days after birth. *Id*. at ¶ 29. The children have remained together in a pre-adoptive foster home since their respective placements. *Id*. at 158.

On November 8, 2021, the court held a combined adjudicatory hearing for J.M. and permanency review for C.M. *Id*. at ¶ 35. The court adjudicated J.M. dependent and, in furtherance of J.M.'s permanency goal of reunification, required Mother to maintain sobriety, cooperate with her mental health team, and attend coached visitations. *Id*. at ¶ 36. With respect to C.M.'s permanency review, the court found that Mother's compliance with her objectives and her progress toward reunification were minimal. Specifically, Mother continued to abuse cocaine, failed to attend random drug screens, avoided the IPV program, and participated in only twelve out of a possible twenty-two supervised visits with C.M. *Id*. at ¶¶ 32, 35. In fact, at every permanency review hearing with respect to C.M. and J.M., the court concluded that both Mother's compliance and her progress were minimal. *Id*. at ¶ 40.

On May 5, 2022, CYF filed a petition for the involuntary termination of Mother's parental rights to C.M. pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Four months later, it filed a petition to terminate Mother's rights to J.M. pursuant to § 2511(a)(2), (5), and (b). The evidentiary hearings on the petitions occurred on September 30, 2022, and October 21, 2022, respectively.[2]

---

[2] C.M. and J.M., then one and two years old, respectively, were represented by legal counsel who advocated in favor of terminating Mother's parental rights. Counsel also filed a brief with this Court in support of the termination orders.

CYF presented the testimony of Gregory Lobb, Ph.D., the court-appointed forensic psychologist who performed an evaluation of Mother in May and June of 2022 and diagnosed her with unspecified bipolar disorder, generalized anxiety disorder, cannabis use disorder, stimulant use disorder, and alcohol use disorder. **See** N.T., 9/30/22, at 20-21. In addition, the agency called to the stand the assigned CYF caseworker, Erin Snyder, and Sara Kohnfelder from TRAC Services for Families. Mother testified, and she presented the testimony of Shawna Copeland, her family support partner from Allegheny Family Network.

On October 25, 2022, the orphans' court involuntarily terminated Mother's parental rights to C.M. and J.M. pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[3] Mother timely filed notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[4] The orphans' court filed its 1925(a) opinion on December 19, 2022.

Mother presents the following issue for our review:

Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental

_____

[3] To the extent that the orphans' court terminated Mother's parental rights to J.M. pursuant to § 2511(a)(8), it erred because CYF did not plead this subsection in its petition. **See In Interest of: T.J.J.M.**, 190 A.3d 618, 629 (Pa.Super. 2018).

[4] This Court consolidated the appeals *sua sponte*.

- 4 -

rights would serve the needs and welfare of [C.M. and J.M.] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 4.

We consider Mother's issue mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the orphans' court's findings of fact and credibility determinations if the record supports them. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). An appellate court may disturb a ruling supported by competent evidence in the record only upon discernment of an error of law or abuse of discretion. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

In this context, "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123-24.

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.

§ 2511. The trial court must initially determine whether the conduct of the parent warrants termination under § 2511(a). Only if the court determines that the petitioner established grounds for termination under § 2511(a) does it then engage in assessing the petition under § 2511(b), which involves a child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

To involuntarily terminate parental rights, the petitioner must prove grounds under both § 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra* at 359 (*quoting Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). It is axiomatic that we need only agree with any one subsection of § 2511(a), along with § 2511(b), to affirm the termination of parental rights. *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted).

Mother challenges the orphans' court's needs and welfare analysis pursuant to § 2511(b), which provides as follows:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our Supreme Court explained that when examining the effect upon a child of severing a bond, courts must examine whether the termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 620 A.2d 481, 484-485 (Pa. 1993). The High Court also recognized that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268.

It is beyond cavil that, "[w]hile a parent's emotional bond with his or parent is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa.Super. 2014). In this vein, the *In re E.M.* Court highlighted, "[i]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *In re E.M.*, *supra* at 484-485. Similarly, the court may consider the effect of the parent's conduct upon the child and contemplate "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d 517, 524 (Pa.Super. 2021). Finally, in weighing the parent-

- 7 -

child bond pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, *supra* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, Mother argues that the record evidence does not support termination under § 2511(b) because C.M. and J.M. have a beneficial bond with her and there is no evidence regarding "the impact that termination" would have on them. Mother's brief at 13. The certified record belies both aspects of this contention.

> In terminating Mother's parental rights, the orphans' court concluded:

> At best, the testimony and evidence demonstrated that [C.M. and J.M.] were merely familiar and comfortable in Mother's presence for brief periods of supervised time. In weighing whether termination would cause extreme, irreparable emotional consequences to [C.M. and J.M.], there was no evidence that [they] would suffer such consequences. Moreover, the evidence supported that any potential detriment or consequences would be mitigated by the positive, loving, supportive, and secure relationship [C.M. and J.M.] established with the foster parents.

Orphans' Court Opinion, 12/19/22, at 14. The evidence supports the court's findings.

During the evidentiary hearing, Dr. Lobb testified about (1) his forensic psychological evaluation of Mother; (2) the respective interactional evaluations of Mother with C.M. and J.M., and between the children with the foster parents; and (3) whether he observed any meaningful parent-child

bonds. In short, Dr. Lobb did not believe that it would be emotionally detrimental to C.M. or J.M. if the court terminated Mother's parental rights. N.T., 9/30/22, at 37-38. In fact, he recommended adoption because it could be detrimental to C.M. and J.M. if permanency was not achieved as soon as possible. *Id*. at 37. His analysis follows.

Dr. Lobb observed a bond between Mother and both children but was unable to assess the significance of the bond because Mother became upset and terminated the interactional evaluation prematurely after C.M. referred to the foster mother as "Mommy." *Id*. at 33. He explained, "I think there was a bond there, for sure. Again, it was cut short with only half of what I normally have. Sometimes as the interactional goes on . . . other things do sort of occur in the last half hour that would provide additional information. . . . My biggest concern with [Mother] is her stability. *Id*. at 36. He further highlighted his doubts about Mother's "ability to be able to take care of these kids in an unstructured, unsupervised kind of setting by herself, when she was only able to last thirty minutes in my office." *Id*. at 34.

In contrast to Mother's truncated interactional evaluation, Dr. Lobb characterized the children's interaction with foster parents as excellent, noting, "They were both very engaged with the kids. They worked well together. . . ." *Id*. at 35. Dr. Lobb identified "a strong bond" between both children and the foster parents. *Id*. at 36. Significantly, Ms. Snyder, the CYF caseworker, shared Dr. Lobb's assessment of the bond the children have with

the foster parents, who the children refer to as "Mom" and "Dad." *Id*. at 159.

Ms. Snyder testified that the primary bond of C.M. and J.M. "appears to be

with the foster family[.]" *Id*. at 162.

To the extent that Mother argues that Dr. Lobb's recommendation in

favor of the termination of parental rights was based "in part on the foster

parents' indication that they would allow future contact between Mother" and

C.M. and J.M., that assertion misrepresents the substance of his testimony.

Mother's brief at 12. On cross-examination by Mother's counsel, Dr. Lobb

testified:

> Q. [I]f I heard you correctly, you weren't concerned [about] the children suffering any detriments if Mother's rights were terminated. But I thought I heard you say something about the foster parents being willing to allow contact. Is that why you feel there wouldn't be any detriment, because there would be post[-]adoption contact?
>
> A. No. I don't think there would be detriment because . . . foster parents . . . are the primary caregivers of these children at this point. . . .

*Id*. at 46. Hence, the record not only belies Mother's contention that

Dr. Lobb's support of terminating parental rights was contingent upon

Mother's continued post-adoption contact with the children, insofar as

Dr. Lobb did not identify any detriments if Mother's rights were terminated, it

further bolsters the orphans' court's conclusion that the children did not share

a necessary and beneficial relationship with Mother.

Moreover, Dr. Lobb testified that Mother's alcoholism and drug addiction

remained unstable. While Mother participated in a rehabilitation program and

self-reported attaining approximately two months of sobriety, Dr. Lobb indicated that "it seemed like her substance use was not completely under control at th[e] point" he evaluated her. He explained, "I don't consider [it] to be stable[.] [I]t's positive but there is a long road ahead. . . ." *Id*. at 24.

As it relates to the effect of Mother's behaviors on the children, Dr. Lobb testified, "I am concerned that while mom appears to make progress in certain areas and h[as] been working at times to address her substance abuse issues [and] mental health issues, I'm concerned about her stability and these kids continue to wait without permanency because of that." *Id*. at 37.

Like Dr. Lobb, Ms. Kohnfelder, the caseworker from TRAC Services for Families, the foster care agency which placed C.M. and J.M., also noted her concerns about the damaging effect of Mother's mental health problems on the children. She confirmed that Mother ended visitations early on at least six occasions "stating that she was feeling anxious or upset on that day on June 18, 2021; September 1, 2021; January 5, 2022; May 30, 2022; April 13, 2022; [and] May 20, 2022[.]" *Id*. at 92. With respect to the supervised visit on May 20, 2022, Mother responded to one child's temper tantrum by bemoaning,

> "I don't know what to do when they get like this . . . I just can't do this. I think I'm going to leave after they eat because I just mentally cannot right now. I know that sounds bad, but if CYF never took them then I would be used to this, but I'm not."

*Id*. at 92, 93.

Similarly, Ms. Kohnfelder described an incident during an earlier supervised visit that occurred on August 11, 2021, when C.M. "had fallen and . . . hit his lip on the ground and it started bleeding. Mother stated, 'I'm a horrible mother and this wouldn't have happened if he wasn't in foster care.' She was unable to remain calm in a stressful situation and she left the visitation." *Id*. at 93. Crucially, Ms. Kohnfelder indicated that Mother never demonstrated an ability to overcome stressful parenting situations and complete the visitations as scheduled. *Id*.

In sum, the foregoing evidence supports the court's conclusion that terminating Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of C.M. and J.M. The witnesses consistently testified both that it would not be detrimental to sever any bond between Mother and C.M. or J.M. and that the primary bonds of both children are with their foster parents, not to Mother. Critically, C.M. and J.M. have lived virtually the entirety of their young lives with their foster parents, who are a pre-adoptive resource. Moreover, the certified record demonstrates that Mother is not capable of providing for a child's safety and security. Specifically, Mother's unresolved substance abuse and mental illness continue to impact her parenting skills as outlined in the revealing discussions about her lack of composure during the supervised visitations.

Accordingly, having discerned no abuse of discretion by the orphans' court, we affirm the orders involuntarily terminating Mother's parental rights to C.M. and J.M.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/16/2023