J-S32031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.E.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 728 MDA 2023 |

Appeal from the Decree Entered April 17, 2023
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  87 AD 2022

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: NOVEMBER 20, 2023**

Appellant B.P. (Father) appeals[1] from the order granting the petition filed by the Dauphin County Social Services for Children and Youth (the Agency) to terminate Father's parental rights to L.E.J.P. (Child), born in September of 2017.  On appeal, Father contends that the Agency failed to meet its burden of proof and that the trial court erred when it involuntarily terminated Father's parental rights.  We affirm.

The trial court set forth an extensive recitation of the factual and procedural history of this case.  **See** Trial Ct. Op., 6/16/23, at 1-32.  Briefly, in June of 2019, Mother agreed to temporarily place Child with a host family because she was undergoing a medical procedure and Father was unable to

---

[1] We note that the order also terminated A.T.'s (Mother's) parental rights. While Mother is not a party to the instant appeal, her appeal from the order shall be addressed in a separate disposition.  **See In the Interest of: L.E.J.P., a Minor, Appeal of A.T., Mother**, 729 MDA 2023.

care for Child because he was employed as a long-haul trucker. After Mother suffered complications from her medical procedure, she entered into a voluntary placement agreement with the Agency, placing Child in the Agency's care and custody.

Following a hearing on July 24, 2019, the trial court adjudicated Child dependent. At that time, the trial court ordered Father to complete several service plan objectives for reunification. Specifically, Father was directed to attend all court hearings, maintain a safe and sanitary home, ensure Child receives routine medical and dental care and also attend Child's scheduled appointments, complete parenting classes, meet Child's basic needs (including hygiene, nutrition, housing, clothing, etc.), participate in Parent-Child Interaction Therapy (PCIT), attend visitation with Child, maintain regular contact with the Agency, and express interest in Child's well-being. N.T. Hr'g, 2/27/23, at 128-32. Following the adjudication hearing, Child was subsequently placed in foster care.

Throughout the course of the instant case, the trial court held ten permanency review hearings, with the most recent taking place on June 9, 2022. Child remained in foster care throughout this entire period. During the termination of parental rights hearing, the Agency's primary caseworker Jillian Kaminskie testified that neither Father nor Mother had "substantially complied to the extent that the Agency would expect them to [comply] to [reunite with Child]" over the course of four years. *Id.* at 138. Specifically, Ms. Kaminskie

testified that she had not seen "any indication that [Father] or [Mother] really, really want[ed] to work hard to get their child back". *Id.*

On September 28, 2022, Child's guardian *ad litem* (GAL), Heather L. Paterno, Esq., filed a motion requesting immediate termination of both Father and Mother's visitation. Specifically, the trial court explained the GAL's position that:

> (1) Child resisted visits and often hid whenever Father came to pick him up at the foster home and that this has been a consistent pattern for more than a year; it often took up to an hour of coaxing for Child to come out of hiding; (2) school officials noticed a dramatic change in Child's demeanor when the Parents would pick him up including that Child would become withdrawn, silent, and would tell teachers he did not want to go, prompting school officials (as mandated reporters) to contact the [GAL] and express their concerns; (3) the foster family stopped informing Child when visits would occur because he would feign illness to avoid visits; (4) Father made false promises to persuade Child to visit or admonished or reprimanded Child for his reluctance to visit, rather than engaging in positive reinforcement; and (5) Mother only sporadically attended [parent-child interactive therapy (PCIT)] sessions, that Child reported during visits Mother often did not come out of her room and that the Parents sometimes shouted at each other when he is with them.
>
> The [GAL] expressed concern that Child's extreme reactions anticipating visits were traumatizing and that his resistance had not diminished in the past year. The [GAL] believed that the family should participate in more intensive parenting education classes to address Child's resistance, learn positive parenting techniques, and help him better adjust to and develop comfort in his Parents' home. She requested that visits thus be suspended pending the [termination of parental rights] hearing, then initially scheduled just three weeks later (on October 19, 2022). The [GAL] also requested that the [trial court] appoint legal counsel for Child, who might accurately represent and convey his wishes to [the trial court]. On September 29, 2022, [the trial court] granted the [GAL's] motion, suspending the Parents' visitation and appointing Sarah Hoffman[, Esq., legal] counsel for Child.

Trial Ct. Op. at 11-12.

On October 6, 2022, the Agency filed a petition seeking termination of Father and Mother's parental rights under 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). The trial court explained:

> After the [termination of parental rights] petition was filed, Child's attorney, [Attorney] Hoffman, filed a petition statement with the [trial] court averring that she had met with Child on multiple occasions, had spoken with him in accordance with his age and developmental level, and that it was clear to her that Child agreed with the termination of parental rights of both [Father and Mother] and a goal change to adoption. Hearings on the [termination of parental rights] petition and goal change were held before [the trial court] on February 27, March 2, [and] April 17, 2023.

Trial Ct. Op. at 13 (citations omitted) (some formatting altered).

Ultimately, the trial court granted the Agency's petition to terminate Mother's and Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b) and to change Child's permanency goal to adoption. Father filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i). The trial court issued a Rule 1925(a) opinion explaining its reasons for terminating Mother's and Father's parental rights.

Father raises the following issues for our review:

1. Were the trial court's findings of fact supported by the record when it involuntarily terminated Father's parental rights where such a determination was not supported by clear and convincing evidence?

2. Did the trial court commit an error of law when it involuntarily terminated Father's parental rights where such a determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S. §§ 2511(a)(1), (2), (5), [and] (8)?

- 4 -

3. Did the trial court commit an error of law when it involuntarily terminated Father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotion needs of [Child] as required by the Adoption Act, 23 Pa.C.S. § 2511(b)?

4. Did the trial court commit an error of law when it involuntarily terminated Father's parental rights where the evidence presented was overwhelming and undisputed that Father demonstrated a genuine interest and sincere and persistent effort to maintain a parent-child relationship with [Child]?

5. Did the trial court err when it suspended visitation without a hearing by order dated September 29, 2022 without providing Father, who was unrepresented by counsel at that time, the meaningful opportunity to respond to such motion when such motion was filed by the guardian *ad litem* on September 28, 2022?

Father's Brief at 3 (some formatting altered).[2]

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

_____

[2] While Father identifies five issues for our review in his statement of questions presented, the argument section of his brief is only divided into three sections: (1) whether the trial court's factual findings are supported by clear and convincing evidence as required by 23 Pa.C.S. § 2511(a); (2) whether the Agency failed to meet its burden of proof under 23 Pa.C.S. § 2511(b); and (3) whether the trial court erred when it suspended Father's visitation without providing Father with an opportunity to respond to a motion filed by Child's GAL.  Father's Brief at 14-24.  We note that the Pennsylvania Rules of Appellate Procedure require that the argument section of the brief be divided into as many parts as there are questions to be argued.  Pa.R.A.P. 2119(a). Failure to do so may result in waiver.  ***Ramalingam v. Keller Williams Realty Group, Inc.***, 121 A.3d 1034, 1042 (Pa. Super. 2015).  While we do not condone Father's failure to comply with the Rules of Appellate Procedure, we find that our ability to render meaningful appellate review is not hindered; therefore, we decline to find waiver on this basis.  ***Id.***

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(1)

Father argues that the trial court erred in concluding that the Agency presented clear and convincing evidence to terminate his parental rights under Section 2511(a)(1). Father's Brief at 15. Specifically, Father argues that he "never demonstrated estrangement or a deliberate decision to terminate his parental relationship during the six months preceding the [underlying] petition[,]" nor has he ever "demonstrated estrangement since this case's inception in 2019." *Id.* at 16. Father further argues that he participated in visitation when permitted, completed a parenting program, maintained contact with the Agency, and attempted to complete his service objectives, including therapy, which Father argues is consistent with his goal of remaining a part of Child's life. *Id.* at 16-17.

Section 2511(a)(1) provides as follows:

**§ 2511.  Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

When reviewing the involuntary termination of parental rights under Section 2511(a)(1), this Court has explained:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court

must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

Further, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

Our courts have explained that parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, [our Supreme] Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In Interest of T.J.J.M.*, 190 A.3d 618, 628 (Pa. Super. 2018) (citations omitted and formatting altered).

This Court has long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

In *Adoption of S.P.*, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that [he] abandoned [his] child.

Applying [*In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975),] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain

- 8 -

> communication and association with that child." [**McCray**, 331 A.2d at 655].
>
> \* \* \*
>
> Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [**In re Adoption of S.P.**, 47 A.3d 817, 828 (Pa. 2012)].

**In re J.R.E.**, 218 A.3d 920, 925 (Pa. Super. 2019) (some citations omitted and some formatting altered).

Here, the trial court addressed Section 2511(a)(1) as follows:

> The evidence established under [Section 2511] (a)(1) that [] "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Most notably, for a period of thirty-nine (39) months—between July 2019, when custody of [] Child was voluntarily relinquished to the Agency and the filing of the [termination of parental rights] petition on October 6, 2022—Father failed to adequately perform parental duties.
>
> Father failed to maintain consistent visits with [] Child early in the case when, as with Mother, his attachment to [] Child was very much in the balance, particularly since he had not been home much after [] Child's birth due to his job. As noted, Father was present to hear all of Dr. Rosen's[3] testimony at the October 2019 permanency review hearing, including the fact that [] Child was in a critical stage for attachment, the possibility that [] Child would be bonding with his consistent caregivers (*i.e.* Foster Parents) and of need for a bonding assessment. He was also present and notified that Mother and Father should participate in couples' counseling.

---

[3] Dr. Howard Rosen was the psychologist who performed Mother's psychological evaluation as part of her court-ordered service objectives. **See** Trial Ct. Op. at 14.

Regarding visitation, the Agency approved visits between Father and [] Child at his foster home during the weekend in July of 2019, Father failed to coordinate the visit, which was his obligation, and offered a non-credible explanation for his failure. Father was later allowed unsupervised visitation with [] Child but due to Father not communicating well with the Foster Parents and arriving late for some visits, supervised visitation was arranged. Again, keeping consistent contact with [] Child was imperative given the critical stage of [] Child's development, including of his attachment. After in-person visits were suspended in March 2020, the Parents were offered video visits with [] Child while at the Foster Parents' home, but Father was inconsistent with visits and would also attempt to contact [] Child when not scheduled for visits, making it difficult for the Foster Parents.

After in-person visits resumed, Father had supervised visits with ChildFirst,[4] which reported to the Agency that it had observed both Parents in need of parenting education because they did not know how to engage [] Child. ChildFirst noted that Father and Mother would not get down on the floor to play with [] Child but would instead sit and play with games and toys by themselves, instead of with [] Child.

As with Mother, when visitation occurred, there were problems noted by third parties. For instance, at a November 6, 2020 supervised visit at ChildFirst, [] Child turned his back on the Parents and mumbled and whined. ChildFirst reported this incident to the Agency and recommend parenting education. On July 29, 2021, while in the Agency waiting room prior to a permanency review hearing, a caseworker observed the Parents having no interaction with [] Child and that the Parents left without saying goodbye. This incident was relayed to the [GAL] who requested a bonding assessment, which was granted. In addition, there was credible evidence presented that daycare personnel and/or the Foster Parents reported that [] Child returned without a fresh diaper or that he had not eaten properly when with Father and Mother. Caseworker [Kaminskie] credibly testified that she believed the Parents never really wanted to visit [] Child.

_____

[4] ChildFirst Family Services provided supervision for some of Father and Mother's visits with Child. *See e.g.* Trial Ct. Op. at 6, 37, 44; Agency's Pet. for Involuntary Termination of Parental Rights, 10/6/22, at ¶ 41.

Finally, during the two years prior to the TPR hearings, Father had only reached out to the Foster Mother about ten times to inquire about the Child's well-being.

*    *    *

Beginning around August 2021, the exchanges between the Parents and [] Child dramatically changed to the point they became extremely traumatic to [] Child, as outlined in detail above. These emotional transitions, which Agency personnel testified were without precedent in their experience, occurred on at least nineteen (19) occasions through January 4, 2022, a period of only four months. Father was present for almost every transition and had to carry [] Child to his car on many occasions, kicking and screaming. The witnesses recounting some of these incidents never indicated that Father ever positively affected the direction of [] Child's emotional outbursts.

As with Mother, the bonding assessments unequivocally reflected that Father was failing to perform parental duties, most notably by failing to meet [] Child's emotional needs. [] Child was found to have a disorganized attachment to Father and perceived both Parents as sources of threat and distress, and that placement of [] Child with them would be detrimental to [] Child's physical, emotional and mental health. It was notable to [the trial court] that during the bonding assessments, when the Parents were brought into the room with [] Child and Foster Parents, [] Child's demeanor immediately changed to hysterical crying, apprehension, and fear. [Donna Mae] Fierras[5] observed that neither Father nor Mother made any attempt to console him. While others tried to calm [] Child down, Father indicated that such outbursts were temporary and [] Child would come out of it "if they stand their ground." [Ms.] Fierras identified this response by Father as reflective of his inability to meet [] Child's emotional needs and that Father should have been trying to soothe him or partake in proactive parenting like directing him to play. [Ms.] Fierras found that both Father and Mother showed [] Child low nurturance and [] Child did not seek out either parent to meet his emotional or physical needs. [] Child's attachment style was characterized by fear and a sense of mistrust of both Parents.

---

[5] Ms. Fierras was the psychologist who conducted the bonding assessment. *See* N.T. Hr'g, 2/27/23, at 21, 23.

- 11 -

During [Ms. Fierras'] observations, Father never attempted to engage [] Child but kept doing paperwork. Because of Father's lack of intervention or engagement, [Ms.] Fierras excluded him from the Strange Situation observations. As noted, to address these significant attachment problems, one of [Ms.] Fierras' primary recommendations was PCIT, especially because of [] Child's fear of his Parents. Father's attendance at PCIT, while much better than Mother's, was still a bit inconsistent, as outlined above.

In addition, the primary caseworker, who had significant contact with the Parents and [] Child over the years, credibly testified that Father (and Mother) had not worked very hard to reunify with [] Child, that she failed to see any attachment or a nurturing bond between them, and observed nothing beneficial to [] Child from his relationship with either parent. The caseworker also credibly testified that she had never seen either parent demonstrate an ability to care for [] Child independently or together as a couple, nor demonstrate a full understanding of what was needed to properly care for a child.

Trial Ct. Op. at 43-46.

Following our review of the record, we discern no abuse of discretion or error of law in the trial court's conclusion that the Agency presented clear and convincing evidence to support termination of Father's parental rights under Section 2511(a)(1). *See T.S.M.*, 71 A.3d at 267.

The record reflects that, at the time of the termination hearing, Child had been in the Agency's care for forty-two months. *See* N.T. Hr'g, 2/27/23, at 78. Although Father has been aware of his single case plan (SCP) objectives throughout the life of the case, he has made minimal progress towards reunification. Specifically, Father failed to maintain consistent visits with Child and failed to adequately coordinate visitation with Foster Parents. *Id.* at 131. Further, the record reflects that Father failed to communicate with Foster

Parents regarding Child's well-being, only reaching out ten times over the two-year period preceding the filing of the termination of parental rights. N.T. Hr'g, 4/17/23, at 15. Therefore, we agree with the trial court that, for a period far in excess of the six-month statutory minimum, Father has refused to perform his parental duties to Child. **J.R.E.**, 218 A.3d at 925; **T.J.J.M.**, 190 A.3d at 628.

With respect to Father's explanation for his conduct, the record reflects that Father generally denied the Agency's allegations. Specifically, in response to the Agency's allegation that Child would return from visits with Father and Mother with a wet diaper or pullup, Father testified that he never knowingly sent Child away from a visit with a soiled diaper or pullup. N.T. Hr'g, 3/2/23, at 89. Father attributed this, in part, to a lack of communication on Child's part. **Id.** at 90. Additionally, Father testified that he missed several therapy sessions due to his work schedule. **Id.** at 104. He also attributed missed therapy sessions to illness, Foster Parents being on vacation, and Mother having an emergency dental procedure. **Id.** Father also testified that he had not been in communication with the Agency regarding visitation since May of 2022. **Id.** at 111. Father further testified that he reached out to Foster Parents on a regular basis to discuss how Child was doing up until "a couple months" before the termination of parental rights hearing. **Id.** at 124-25. When confronted about cancelling scheduled visits, Father could not recall cancelling those visits. **Id.** at 126-29. However, the trial court ultimately credited Ms. Kaminskie's testimony that Father "had not worked very hard" to

unify with Child. **See** Trial Ct. Op. at 44; N.T. Hr'g, 2/27/23, at 138; **see also S.P.**, 47 A.3d at 828 (stating that where a "parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited" (citation omitted)).

Finally, we note that although Father contacted Foster Parents approximately ten times in a period of two years, **see** N.T. Hr'g, 4/17/23, at 15, Father's inconsistent contact with Child was insufficient to "demonstrate a serious intent . . . to recultivate a parent-child relationship" or "a willingness and capacity to undertake the parental role." **See In re Z.P.**, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted).

For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(1).[6] **See T.S.M.**, 71 A.3d at 267; **J.R.E.**, 218 A.3d at 925; **T.J.J.M.**, 190 A.3d at 628. Accordingly, Father is not entitled to relief.

### Section 2511(b)

Father also challenges the trial court's conclusions concerning Section 2511(b). Specifically, Father argues that the trial court erroneously relied upon the bonding assessment conducted by Ms. Fierras. Father's Brief at 22. In support, Father contends that he was not involved in the assessment in any meaningful way and that Ms. Fierras failed to "meaningfully engage" him. **Id.** Father further argues that the testimony describing Child's temper tantrums

---

[6] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a). **B.L.W.**, 843 A.2d at 384.

during custody exchanges provided only a "snapshot in time" and, "that once [Child] calmed down, he enjoyed his visitation with his parents. Father and [Child] went to parks, outings, and spent quality time playing together at Father and Mother's home." *Id.* at 23-24.

Section 2511(b) provides as follows:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by Interest of K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" ***Interest of K.T.***, 296 A.3d 1085, 1106 (Pa. 2023) (quoting ***T.S.M.***, 71 A.3d at 267). In ***K.T.***, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." ***Id.*** at 1113. Indeed, the parent-child bond analysis must include "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.***

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care . . . whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 296 A.3d at 1113 (footnote omitted).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have

an obligation to see to their healthy development quickly. When courts fail .

. . the result, all too often, is catastrophically maladjusted children." ***Id.***

In the instant case, the trial court addressed Section 2511(b) as follows:

[T]he record strongly supported that these needs would be best served by termination of Father's parental rights. The overwhelming evidence presented was that the termination of Father's parental rights will have no detrimental effect on [] Child whereas a severance of any bond between [] Child and [] Foster Parents would be highly detrimental to [] Child. The evidence upon which [Ms.] Fierras based her conclusions was further corroborated by numerous other witnesses, including evidence of traumatic and highly distressing transitions with the Parents and [] Child, and the absence of a perceivable bond between them.

There was no credible evidence presented that termination of [Father's] rights would have a negative impact upon [] Child's developmental, physical and emotional needs, and the welfare of [] Child. [Ms.] Fierras presented evidence that [] Child established predominantly secure and positive attachments or bonding with his Foster Parents and that [] Child would suffer harm if his bonds with the Foster Parents were severed. On the other hand, [] Child had a disorganized attachment to his Parents and perceives them as sources of threat and distress and that placement with his biological parents would be detrimental to [] Child's physical, emotional and mental health. The poor attachment and attachment style [Ms.] Fierras observed was typically seen of a child who has experienced trauma and does not feel physically or emotionally safe with parents and that the attachment style was characterized by fear and mistrust.

Trial Ct. Op. at 47-48 (formatting altered).

Based on our review of the record, we discern no abuse of discretion in the trial court's conclusion that termination of Father's parental rights would best serve Child's needs and welfare. ***See K.T.***, 296 A.3d at 1113; ***T.S.M.***, 71 A.3d at 267. As noted by the trial court, Ms. Fierras testified that she

performed a bonding assessment involving Child. N.T. Hr'g, 2/27/23, at 21, 23. As part of the bonding assessment, Ms. Fierras performed bonding assessments for Father, Mother, and Foster Parents. *Id.* at 23. Ms. Fierras concluded that Child had a "secure attachment" with Foster Parents. *Id.* at 25-26. Ms. Fierras further testified that removing Child from Foster Parents "would not be in his best interests." *Id.* at 35.

Relating to Mother and Father, Ms. Fierras testified that Child's bonding was a "resistant disorganized attachment type." *Id.* at 49. Ms. Fierras specifically stated that such an attachment style "usually stems from poor attachment, inconsistently being able to meet a child's physical and/or emotional needs, not being able to console a child for whatever reason, [and] low nurturance[.]" *Id.* at 50. Ms. Fierras further concluded that Child, during the bonding assessment, did not seek out Mother or Father to meet his emotional or other instrumental needs, and she observed that Child did not try to maintain contact with Mother and Father. *Id.* at 51-52. Ms. Fierras opined that such an attachment style is "characterized by fear and mistrust toward Mother and Father." *Id.* at 52. As noted above, the trial court concluded that there was no credible evidence presented that termination of Father's rights would have a negative impact upon Child's developmental, physical and emotional needs, and the welfare of Child. *See* Trial Ct. Op. at 47. For these reasons, we conclude that the trial court did not abuse its discretion when it terminated Father's parental rights. *See* 23 Pa.C.S. § 2511(b); *K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267.

**GAL's Motion**

In his final issue on appeal, Father alleges that the "trial court erred when it suspended Father's visitation without providing Father the opportunity to respond to the [GAL's] motion." Father's Brief at 23. Specifically, Father argues that the GAL's motion hindered his ability to reunify with Child. *Id.* at 23. Father further argues that his participation in therapy and his progress toward his service objectives "were pulled out from under [him] without the benefit of having input from the [trial] court." *Id.*

The Pennsylvania Rules of Appellate Procedure require that appellate arguments include "discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). Specifically, we have stated that "[w]e shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument[,]" as doing so "would place this Court in the conflicting roles of advocate and neutral arbiter." *Trust Under Deed of Wallace F. Ott*, 271 A.3d 409, 421 (Pa. Super. 2021) (citations omitted). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived." *Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa. Super. 2014) (citation omitted).

Here, Father fails to provide this Court with any discussion of or citation to relevant authority pertaining to his final issue on appeal. Rather, Father raises a general claim of error on the part of the trial court when it suspended visitation without providing Father with the opportunity to respond. *See*

Father's Brief at 23-24.  We find that Father has not sufficiently developed this issue for appellate review; therefore, the issue is waived on appeal.  ***See Trust of Ott***, 271 A.3d at 421; ***Coulter***, 94 A.3d at 1088.  Accordingly, Father is not entitled to relief.  For these reasons we affirm the trial court's order terminating Father's parental rights to Child, L.E.J.P.

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/20/2023